**IN THE UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**DURHAM DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **Advanced Sports Enterprises, Inc., *et al.*,[1]** | ) | |
| | ) | **Case No. 18-80856** |
| | ) | **(Joint Administration Pending)** |
| | ) | |
| Debtors. | ) | |
| | ) | |

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS:
(I) AUTHORIZING THE DEBTORS TO ASSUME THE STORE CLOSING
AGREEMENT; (II) AUTHORIZING AND APPROVING STORE CLOSING SALES
FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES (III)
APPROVING PROCEDURES TO CONDUCT STORE CLOSING SALES IN
ADDITIONAL STORES; AND (IV) GRANTING RELATED RELIEF**

Advanced Sports Enterprises, Inc., Advanced Sports, Inc., Performance Direct, Inc.,

Bitech, Inc. and Nashbar Direct, Inc. (collectively, the "Debtors") file this *Emergency Motion for*

*Interim and Final Orders: (I) Authorizing the Debtors to Assume the Store Closing Agreement;*

*(II) Authorizing and Approving Store Closing Sales Free and Clear of All Liens, Claims and*

*Encumbrances; (III) Approving Procedures to Conduct Store Closing Sales in Additional Stores;*

*and (IV) Granting Related Relief* (the "Motion"). In support of this Motion, the Debtors

respectfully represent as follows:

---

[1] The Debtors in this case, along with each Debtor's case number, are: (i) Advanced Sports
Enterprises, Inc., Case No. 18-80856; (ii) Advanced Sports, Inc., Case No. 18-80857; (iii)
Performance Direct, Inc., Case No. 18-80860; (iv) Bitech, Inc., Case No. 18-80858; and (v)
Nashbar Direct, Inc., Case No. 18-80859. Each Debtor is a North Carolina Corporation.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this proceeding is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for relief requested herein are sections 105, 363, 365 and 554 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rules 2002, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## RELIEF REQUESTED

3.      By this Application, the Debtors move for the entry of (1) an interim order in the form attached hereto as Exhibit A (the "Interim Order"):  (i) finding that the *Store Closing Program – Consulting Agreement* dated as of October 31, 2018, by and between the Debtors and Gordon Brothers Retail Partners, LLC (the "Store Closing Agreement"), a copy of which is attached as Exhibit 1 to the Interim Order, is assumed on an interim basis; (ii) authorizing the Debtors to continue to conduct Store Closing Sales in accordance with the terms of the Store Closing Agreement and store closing sale guidelines (the "Sale Guidelines"), a copy of which is attached as Exhibit 2 to the Interim Order, with such sales to be free and clear of all liens, claims and encumbrances; (iii) authorizing procedures to conduct Store Closing Sales in any additional closing stores; and (iv) granting certain related relief, on an interim basis (collectively, the "Inventory Sale Relief"), and (2) following service of this motion and after an opportunity to be heard at a final hearing (the "Final Hearing"), a final order (the "Final Order"), authorizing the assumption of the Store Closing Agreement and granting the Inventory Sale Relief on a final basis.

## BACKGROUND

4.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under Chapter 11 of the Bankruptcy Code.

5.    The factual background relating to the Debtors' commencement of these cases is set forth in detail in the *Declaration of Patrick Cunnane in Support of First Day Motions and Applications* filed on the Petition Date and incorporated herein by reference.

6.    The Debtors have continued in possession of their properties and have continued to manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.    The Debtors design, manufacture and sell, as both a wholesaler and retailer, top bicycle brands and accessories.  The Debtors operate more than one hundred (100) retail stores in approximately twenty (20) states.

8.    Prior to the Petition Date, the Debtors' management, with the assistance of their financial advisors, completed a comprehensive review of the performance of their retail stores to analyze the profitability and viability of each store location.  At the end of this process, the Debtors identified certain underperforming and/or unprofitable store locations and determined that it was necessary to initiate store closing or other mutually agreed upon themed sales ("Store Closing Sales") at these store locations and possibly additional store locations.

### The Store Closing Agreement[2]

9.    On October 31, 2018, the Debtors entered into the Store Closing Agreement with

---

[2]  Capitalized terms not otherwise defined herein have the meanings given to them in the Store Closing Agreement.  To the extent that this summary differs in any way from the terms set forth in the Store Closing Agreement, the terms of the Store Closing Agreement control.

3

Gordon Brothers Retail Partners, LLC ("Gordon Brothers")[3], a copy of which is attached as Exhibit 1 to the Interim Order attached hereto as Exhibit A.  Pursuant to the Store Closing Agreement, the Debtors retained Gordon Brothers as their exclusive, independent consultant to conduct Store Closing Sales at forty (40) of its retail locations identified in Exhibit A to the Store Closing Agreement (each a "Store" and collectively, the "Stores"), with the understanding that the agreement could be amended to include additional store locations (the "Additional Stores") as determined by the Debtors in the exercise of their reasonable business judgment.

10.     The Debtors entered into the Store Closing Agreement to ensure that the liquidation of inventory (the "Merchandise") and certain furniture, fixtures, and equipment that the Debtors do not wish to retain (collectively, the "Offered FF&E" and, together with the Merchandise, the "Store Assets") at the respective Stores is managed efficiently and effectively. The Debtors do not possess the necessary resources in-house to coordinate the Store Closing Sales on a company-wide scale.  The Debtors selected Gordon Brothers to handle the Store Closing Sales based upon its extensive experience in conducting retail liquidation sales, its ability to assist in the management and implementation of the Store Closing Sales in an efficient and cost-effective matter, and other factors.

11.     As set forth in the Store Closing Agreement, the primary services provided by Gordon Brothers can be summarized as follows:

> a.      Recommend appropriate discounting to effectively sell all of the Debtors' goods located at the Stores as of the Sale Commencement Date in accordance with a "store closing" and other mutually agreed upon themed sale, and recommend appropriate point-of-purchase, point-of-sale, and other internal and external advertising in connection therewith;

---

[3] Gordon Brothers has disclosed to the Debtors certain historical connections between Gordon Brothers and certain of its affiliates and the Debtors, as set forth in Paragraph 9 of the Store Closing Agreement.

     b.     Provide qualified supervision to oversee the conduct of the Sale;

     c.     Maintain focused and constant communication with store-level employees and managers to keep them abreast of strategy and timing and to properly effect store-level communication by the Debtors' employees to customers and others about the Sale;

     d.     Establish and monitor accounting functions for the Sale, including evaluation of sales of the Debtors' goods located at the Stores by category, sales reporting and expense monitoring;

     e.     Recommend loss prevention strategies;

     f.     Coordinate with the Debtors so that the operation of the Stores is being properly maintained including ongoing customer service and housekeeping activities;

     g.     Recommend customized strategies to transition the Debtors' customers to the Debtors' ongoing retail stores and e-commerce platform; and,

     h.     Recommend appropriate staffing levels for the Stores and appropriate bonus and/or incentive programs (to be funded by the Debtors) for Store employees.

12.     In consideration of its services, the Debtors have agreed to pay Gordon Brothers a sliding "Incentive Fee" ranging from 0% to 1.75% of Gross Proceeds, which is tied to Merchandise Sales and the Aggregate Recovery Percentage.  Gordon Brothers will be reimbursed for certain expenses incurred in connection with the Store Closing Sales upon presentation of reasonable documentation for expenses actually incurred in an amount up to $849,031 (or such greater amount as mutually agreed by Gordon Brothers and Debtors).  Gordon Brothers will also receive a separate 15% commission for selling the Offered FF&E, together with reimbursement of Gordon Brothers' expenses incurred in connection with disposing of such Offered FF&E within the limits of a mutually agreed FF&E expense budget.

## BASIS FOR RELIEF

13.     The Debtors request authority to: (a) assume the Store Closing Agreement; (b) continue the conduct of the Store Closing Sales at the Stores and any Additional Stores pursuant

to the Store Closing Sale and the Sale Guidelines, with such sales to be free and clear of all liens, claims and encumbrances; and (c) receive certain related relief.

**A.      The Court Should Authorize the Assumption of the Store Closing Agreement.**

14.      Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Lubrizol Enters., Inc. v. Richmond Metal Finishes, Inc., 765 F. 2d 1043, 1046-47 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986); In re Minges, 602 F. 2d 38, 42 (2d Cir. 1979); In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject an executory contract is governed by the business judgment standard and it can only be overturned if the decision was a product of bad faith, whim or caprice).

15.      The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, 762 F.2d 1303, 1311 (5th Cir. 1985).

16.      The assumption of the Store Closing Agreement is beneficial to the Debtors' estates, and therefore is a reasonable exercise of the Debtors' business judgment. In order to

maximize the value of their estates, the Debtors must sell the Sale Assets prior to the conclusion of the 210-day period to assume or reject leases set forth in section 365(d)(4) of the Bankruptcy Code. Any delay in commencing the Store Closing Sales will jeopardize the value that can be recovered from the Sale Assets during these proceedings.

17.     Gordon Brothers brings significant experience and expertise to assist the Debtors in conducting the Store Closing Sales, and can oversee the Store Closing Sales in an efficient and cost-effective manner. The terms of the Store Closing Agreement are the result of arm's length bargaining and are the best terms available to the Debtors.

18.     Assumption of the Store Closing Agreement will enable the Debtors to continue uninterrupted the conduct of the Store Closing Sales and utilize the skills and resources of Gordon Brothers for the benefit of all stakeholders. If the Store Closing Agreement is not assumed on an interim basis, the estates would lose the benefit of the momentum and preparation that began prior to the Petition Date. Delay in or interruption of the Store Closing Sales would lead to loss of value of the Sale Assets. Finally, given that Gordon Brothers is already familiar with the Debtors' businesses and has commenced the Store Closing Sales, replacing Gordon Brothers with an alternative asset disposition firm at this time would be difficult and highly inefficient.

**B.     The Debtor Has a Valid Business Justification for the Store Closing Sales.**

19.     Section 105(a) of the Bankruptcy Code provides, in pertinent part, that "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b)(1) of the Bankruptcy Code, which governs asset sales outside of a debtor's ordinary course of business, provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1). When selling assets outside of the ordinary course of business, a debtor must articulate a valid business justification to obtain court approval. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Abbotts Dairies, Inc., 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp. and requiring good faith); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the Abbotts Dairies decision); Dai-Icho Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999) (same). When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in Chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted).

20. Store closing or asset disposition sales are a routine occurrence in chapter 11 cases involving retail debtors. See Ames Dept. Stores, 136 B.R. at 359 (noting that liquidation sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"). As such, bankruptcy courts have approved similar store closing sales. See, e.g., In re Rockport Co., LLC, Case No. 18-11145 (LSS) (Bankr. D. Del. Jun. 13, 2018); In re Bon-Ton Stores, Inc., Case No. 18 10248 (MFW) (Bankr. D. Del. Feb. 7, 2018); In re Aerogroup Int'l Inc.,

Case No. 17-11962 (KJC) (Bankr. D. Del. Sept. 19, 2017); In re Sports Authority Holdings, Inc.,

Case No. 16-10527 (MFW) (Bankr. D. Del. Mar. 3, 2016); In re RadioShack Corp., Case No.

15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015).

21.     Sufficient business justification exists to approve the proposed Store Closing

Sales under section 363(b)(1).  The Debtors, with the assistance of their financial advisors, have

determined that continuing the Store Closing Sales, on the expedited basis set forth herein,

represents the best alternative to maximize recoveries to the Debtors' estates.  There is a

meaningful amount of Merchandise included in the Store Closing Sales that will be monetized

most efficiently and quickly through an orderly process conducted in consultation with an

experienced asset disposition firm.

**C.     The Court Should Approve the Store Closing Sales Free and Clear of all Liens,
        Encumbrances and Other Interests under Bankruptcy Code Section 363(f)**

22.     The Debtors request approval to sell the Sale Assets on a final, "as is" basis, free

and clear of any and all liens, claims and encumbrances in accordance with section 363(f) of the

Bankruptcy Code.  A debtor in possession may sell property under sections 363(b) and 363(f)

"free and clear of any interest in such property of an entity other than the estate" if any one of the

following conditions is satisfied:  (a) applicable non-bankruptcy law permits sale of such

property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the

price at which such property is to be sold is greater than the aggregate value of all liens on such

property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a

legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).

23.     The Debtors' prepetition secured lender and proposed DIP lender, Wells Fargo

Bank, N.A., supports the assumption of the Store Closing Agreement and recognizes the benefits

provided to the estates.  With respect to any other party asserting a lien, claim, or encumbrance

against the Sale Assets, the Debtor anticipates that it will be able to satisfy one or more of the

conditions set forth in section 363(f).  In connection with the sale of the Sale Assets, the Debtor

proposes that any liens, claims, and encumbrances asserted against the Sale Assets be transferred

to and attach to the amounts realized by the Debtors through the Store Closing Sales.

**D.  The Court Should Approve the Proposed Sale Guidelines Notwithstanding Contrary Laws Regarding Store Closing Sales and Lease Restrictions.**

24.    As a necessary part of this process, the Debtors request authority to conduct the

Store Closing Sales in accordance with the Sale Guidelines and without complying with

applicable state and local laws, statutes, rules and/or ordinances governing store closing,

liquidation or similar sales (collectively, the "Liquidation Laws").  Although the Debtors intend

to comply with state and local health and safety laws and consumer protection laws in

conducting the Store Closing Sales, many Liquidation Laws require special and cumbersome

licenses, waiting periods, time limits and other procedures for store closing, liquidation or similar

sales.

25.    To eliminate the time, delay and expense associated with the administrative

procedures necessary to comply with the Liquidation Laws, the Debtors propose to utilize the

Sale Guidelines as a means to streamline the administrative burdens on their estates while still

adequately protecting the broad and varied interests of both landlords and applicable

governmental agencies charged with enforcing any Liquidation Laws that may apply to the Store

Closing Sales.

26.    Bankruptcy courts have consistently recognized that federal bankruptcy law

preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.

See Belculfine v. Aloe (In re Shenango Group, Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995)

("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the

bankruptcy code. . . .  [A] state statute [] cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), aff'd, 112 F.3d 633 (3d Cir. 1997).  Courts have found that preemption of state law is not appropriate if the laws deal with public health and safety.  See Baker & Drake, Inc. v. Public Serv. Comm'n of Nev. (In re Baker & Drake,  Inc.), 35 F.3d 1348, 1353-54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure).  However, preemption is appropriate where the only state laws involved concern economic regulation rather than the protection of public health and safety.  See In re Baker & Drake, Inc., 35 F.3d at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

27.    Under the circumstances of these proceedings, enforcing the strict requirements of the Liquidation Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to maximize the value of the Sale Assets for the benefit of creditors.  Accordingly, authorizing the Store Closing Sales without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and similar items is necessary and appropriate.  The requested waiver is narrowly tailored to facilitate the successful consummation of Store Closing Sales.  The Debtors do not seek a general waiver of all state and local requirements, but only those that apply specifically to liquidation sales.  In fact, the Debtors do not seek a waiver of, and will comply with, applicable state and local public health and safety laws, and applicable tax, labor, employment, environmental and consumer protection laws, including consumer laws regulating deceptive

practices and false advertising.

28.    Further, Courts have recognized that the Bankruptcy Code preempts certain state laws and have granted relief similar to that requested herein.  See, e.g., In re Rockport Co., LLC, Case No. 18-11145 (LSS) (Bankr. D. Del. Jun. 13, 2018) (stating that the debtors were authorized to conduct the store closing sales under the terms of the order "without any further showing of compliance" with liquidation laws); In re Bon-Ton Stores, Inc., Case No. 18-10248 (MFW) (Bankr. D. Del. Feb. 7, 2018) (stating that the debtors are authorized to conduct the closing sales under the terms of the order "without the necessity of showing compliance" with liquidation laws); In re Aerogroup Int'l Inc., Case No. 17-11962 (KJC) (Bankr. D. Del. Sept. 19, 2017) (stating that "each and every federal, state, or local agency, departmental or governmental unit with regulatory authority over the Retail Inventory Liquidation Sales and all newspapers and other advertising media in which the Retail Inventory Liquidation Sales are advertised shall consider this Interim Order as binding authority that no further approval, license, or permit of any governmental unit shall be required, nor shall the Debtors be required to post any bond, to conduct the Retail Inventory Liquidation Sales"); In re Sports Authority Holdings, Inc., Case No. 16-10527 (MFW) (Bankr. D. Del. Mar. 3, 2016) (stating that "the Debtors shall be presumed to be in compliance with any Liquidation Laws and are authorized on an interim basis to conduct the Closing Sales in accordance with the terms of this Interim Order and the Sale Guidelines without the necessity of showing compliance with any Liquidation Laws during the Interim Period"); In re RadioShack Corp., Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015) (stating that "[p]rovided that the Inventory Liquidation Sales and the sale of Merchandise and FF&E are conducted in accordance with the terms of this Interim Order, the Consulting Agreement and the Sale Guidelines, and in light of the provisions in the laws of many

Governmental Units that exempt court-ordered sales from their provisions, the Debtors shall be presumed to be in compliance with any GOB Laws and Liquidation Laws" without the necessity of further showing compliance with any such GOB Laws and Liquidation Laws).

29.     Certain of the Debtors' leases governing the premises of the Stores and, if applicable, Additional Stores, subject to any Store Closing Sales may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code.  Ames Dep't Stores, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); In re R. H. Macy and Co., Inc., 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); In re Tobago Bay Trading Co., 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); In re Lisbon Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

30.     In addition, Courts have held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable.  See, e.g., In re Rockport Co., LLC, Case No. 18-11145 (LSS) (Bankr. D. Del. Jun. 13, 2018); In re Bon-Ton Stores, Inc., Case No. 18-

10248 (MFW) (Bankr. D. Del. Feb. 7, 2018); In re Aerogroup Int'l Inc., Case No. 17-11962

(KJC) (Bankr. D. Del. Sept. 19, 2017); In re Sports Authority Holdings, Inc., Case No. 16-10527

(MFW) (Bankr. D. Del. Mar. 3, 2016); In re RadioShack Corp., Case No. 15-10197 (BLS)

(Bankr. D. Del. Feb. 6, 2015).  Thus, as a result of the above and to the extent that such

provisions or restrictions exist in any of the leases of the Stores or Additional Stores subject to

the Store Closing Sales, the Debtors request that the Court authorize the Debtors and/or Gordon

Brothers to conduct the Store Closing Sales without interference by any landlords or other

persons affected, directly or indirectly, by the Store Closing Sales.

**E.     The Court Should Approve the Abandonment of Certain Property in Connection
with Any Store Closing Sales.**

31.     After notice and a hearing, a debtor "may abandon any property of the estate that

is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11

U.S.C. §554(a); see also Hanover Ins. Co. v. Tyco Indus., Inc., 500 F.2d 654, 657 (3d Cir. 1974)

(stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems

less valuable than the cost of asserting that claim").

32.     The Debtors are seeking to sell certain Offered FF&E remaining in the Stores.

However, the Debtors may determine that the costs associated with holding or selling certain

property or Offered FF&E exceeds the proceeds that will be realized upon its sale, or that such

property is not sellable at all.  In such event, the property is of inconsequential value and benefit

to the estates and/or may be burdensome to retain.

33.     To maximize the value of the Debtors' assets and to minimize the costs to the

estates, the Debtors respectfully request authority to abandon in place any of its remaining

Offered FF&E or other property located at any of the Stores without incurring liability to any

person or entity.  The Debtors further request that the landlord of each Store or Additional Store

at which any abandoned Offered FF&E or other property is located be authorized to dispose of such property without liability to any third parties.

34.    Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (that is, information that alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

**F.    The Court Should Approve the Procedures Relating to Store Closing Sales at Additional Stores.**

35.    Subsequent to the filing of this Motion, the Debtors in the exercise of their reasonable business judgment may determine that Store Closing Sales should commence at Additional Stores owned by the Debtors.  The Debtors request that the Store Closing Agreement (as subsequently amended to incorporate the Additional Stores), the Sale Guidelines, and any Interim and/or Final Order approving this Motion apply to Store Closing Sales at Additional Stores identified by the Debtors.  If the Debtors seek to conduct Store Closing Sales at any Additional Stores, the Debtors and Gordon Brothers will (a) enter into an amendment to the Store Closing Agreement (an "Amendment") which identifies the Additional Stores, the expense budget for such stores, the start date and end date of the Store Closing Sales at such stores, and any adjustments to the Aggregate Recovery Percentage and/or Incentive Fee under the Store Closing Agreement; (b) file the Amendment with the Court; and (c) serve a notice (the "Notice") of their intent to conduct such Store Closing Sales, along with a copy of the Amendment, on the applicable landlords and the Master Service List (as set forth in the *Debtors' Emergency Motion*

*for an Order Establishing Notice and Administrative Procedures* filed contemporaneously herewith) by email (to the extent available to the Debtors) or overnight mail.  The Debtors propose that any objection to the terms of an Amendment or the Store Closing Sales at the Additional Stores be filed with the Court within seven (7) days after service of the Notice.  If no timely objections are filed, then the Debtors and Gordon Brothers would be authorized to proceed with conducting Store Closing Sales at the applicable Additional Stores in accordance with the Store Closing Agreement and Amendment, the Interim and/or Final Order approving this Motion, and the Sale Guidelines.  If any objections are filed, the matter would be scheduled for hearing on an expedited basis.

<u>**EMERGENCY CONSIDERATION AND REQUEST FOR WAIVER OF STAY**</u>

36.     The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  Here, the Debtors believe that an orderly transition into chapter 11 and the continuance of the Store Closing Sales is critical if the Debtors are to maximize the value of their estates for all stakeholders.  Any delay in granting the relief requested could cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 says of the chapter 11 cases would severely diminish the value of the Sale Assets at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

37.     Further, pursuant to Bankruptcy Rule 6004(h), "an order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry

of the order, unless the court orders otherwise." As set forth above, the Debtors submit that ample cause exists to justify (a) the immediate entry of an order granting the relief sought herein and (b) a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h).

## CONSENT TO JURISDICTION

38.     The Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court lacks adjudicatory authority under Article III of the United States Constitution to enter such final order or judgment absent consent of the parties.

## NOTICE

39.     Notice of this Motion shall be provided as set forth in the Debtors' Emergency Motion for Order Shortening Notice and Scheduling Expedited Hearing on First Day Motions, or as may otherwise be directed by the Court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Interim Order, substantially in the form attached hereto as Exhibit A, granting, on an interim basis, the Inventory Sale Relief, (ii) set a date for a Final Hearing on the assumption of the Store Closing Agreement and the Inventory Sale Relief sought in the Motion, and (iii) grant such other relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: November 16, 2018                Respectfully submitted,

NORTHEN BLUE LLP

/s/ John A. Northen
John A. Northen
North Carolina State Bar No. 6789
jan@nbfirm.com
Vicki L. Parrott
North Carolina State Bar No. 25449
vlp@nbfirm.com
John Paul H. Cournoyer
North Carolina State Bar No. 42224
jpc@nbfirm.com
1414 Raleigh Road, Suite 435
Chapel Hill, North Carolina  27517
Telephone:  (919) 968-4441

PROPOSED COUNSEL FOR THE
DEBTORS-IN-POSSESSION

**FLASTER/GREENBERG P.C.**
William J. Burnett (PA Bar No. 75975)
(*pro hac* application pending)
Harry J. Giacometti (PA Bar No. 55861)
(*pro hac* application pending)
Damien Nicholas Tancredi (PA Bar No. 308317)
(*pro hac* application pending)
1835 Market Street, Suite 1050
Philadelphia, PA 19103
(215) 279-9383 Telephone
(215) 279-9394 Facsimile
william.burnett@flastergreenberg.com

**<u>EXHIBIT A</u>**

**(Proposed Order)**

## IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## DURHAM DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **Advanced Sports Enterprises, Inc., *et al.*,[1]** | ) | |
| | ) | **Case No. 18-80856** |
| | ) | **(Joint Administration Pending)** |
| | ) | |
| **Debtors.** | ) | |
| | ) | |

## INTERIM ORDER: (I) AUTHORIZING THE DEBTORS TO ASSUME AND OPERATE UNDER THE STORE CLOSING AGREEMENT; (II) AUTHORIZING AND APPROVING STORE CLOSING SALES FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (III) APPROVING PROCEDURES TO CONDUCT STORE CLOSING SALES IN ADDITIONAL STORES; AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the Debtors for the entry of an interim order (the

"Interim Order"), pursuant to Bankruptcy Code sections 105, 363, 365 and 554 and Bankruptcy

Rules 2002, 6003 and 6004; (a) authorizing the Debtors to operate under the Store Closing

Agreement dated as of October 31, 2018, by and between the Debtors and Gordon Brothers

---

[1] The Debtors in this case, along with each Debtor's case number, are: (i) Advanced Sports Enterprises, Inc., Case No. 18-80856; (ii) Advanced Sports, Inc., Case No. 18-80857; (iii) Performance Direct, Inc., Case No. 18-80860; (iv) Bitech, Inc., Case No. 18-80858; and (v) Nashbar Direct, Inc., Case No. 18-80859. Each Debtor is a North Carolina Corporation.

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion or the Consulting Agreement.

Retail Partners, LLC ("Gordon Brothers"), a copy of which is attached as Exhibit 1 to this Interim Order (the "Store Closing Agreement"); (b) authorizing the Debtors to continue to operate "store closing" or other mutually agreed upon themed sales (the "Store Closing Sales") in accordance with the terms of the Store Closing Agreement and store closing sale guidelines (the "Sale Guidelines"), a copy of which is attached as Exhibit 2 to this Interim Order, with such sales to be free and clear of all liens, claims, encumbrances, defenses (including, without limitation, rights of setoff and recoupment) and interests, including, without limitation, security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, liens, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, the "Encumbrances"); (c) authorizing procedures to conduct Store Closing Sales in any additional closing stores from time to time designated by the Debtors (the "Additional Stores"); and (d) granting certain related relief, on an interim basis (collectively, the "Inventory Sale Relief");

and the Court having reviewed the Motion and the *Declaration of Patrick Cunnane in Support of First Day Motions and Applications* and having considered the statements of counsel and the evidence adduced with respect to the Motion at a hearing before the Court (the "Hearing"); the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, (ii) venue is proper in this district pursuant to 28 U.S.C. § 1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iv) the notice of the Motion and the Hearing was sufficient under the circumstances, and (v) there is good cause to waive the stay of Bankruptcy Rule 6004(h); after due deliberation determined that the relief requested in the Motion is necessary on an interim basis and essential for the Debtors' reorganization and such relief is in the best interests of the Debtors, their estates and their creditors; and upon the record herein; and after due deliberation thereon; and good and sufficient cause having been shown; it is hereby:

FOUND AND DETERMINED THAT:[3]

A.    The Debtors have advanced sound business reasons for assumption of the Store Closing Agreement, on an interim basis subject to the Final Hearing, as set forth in the Motion and at the Hearing, and operating under the Store Closing Agreement is a reasonable exercise of the Debtors' business judgment and in the best interests of the Debtors and their estates.

B.    The conduct of the Store Closing Sales will provide an efficient means for the Debtors to dispose of the Sale Assets.

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.  See Fed. R. Bankr. P. 7052.

C.      The Store Closing Agreement was negotiated, proposed and entered into by Gordon Brothers and the Debtors without collusion, in good faith and from arm's length bargaining positions.

D.      Assumption of the Store Closing Agreement on an interim basis is a sound exercise of the Debtors' business judgment.

E.      The Debtors have represented that, they are not seeking to either sell or lease personally identifiable information during the course of the Store Closing Sales; *provided, however*, that Gordon Brothers will be authorized to distribute emails and promotional materials to the Debtors' customers consistent with the Debtors' existing policies on the use of consumer information.

F.      The Debtors and Gordon Brothers may sell the Sale Assets free and clear of all Encumbrances as provided for herein because, in each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.  Those holders of any such Encumbrances who did not object, or who withdrew their objections, to the entry of this Interim Order are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of any such Encumbrances who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having such Encumbrances attaching to the proceeds of the sale of the applicable Sale Assets with the same validity and priority and to the same extent and amount that any such Encumbrances had with respect to such Sale Assets.  Notwithstanding anything contrary in this Order, the liens of Wells Fargo Bank, N.A. ("Wells Fargo") shall attach to the proceeds of the Store Closing Sales with the same validity and priority and to the same extent and amounts as their liens had with respect to the Sale Assets.

G.     The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and the Debtors have demonstrated good, sufficient and sound business purposes and justifications for the relief approved herein.

H.     The Store Closing Sales are in the best interest of the Debtors' estates.

I.     The entry of this Interim Order is in the best interest of the Debtors and their estates, creditors and interest holders and all other parties in interest herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     The Motion, on an interim basis, is GRANTED as provided herein.

2.     On _____, 2018, at _____ __.m (prevailing Eastern Time), a hearing (the "Final Hearing") will be held before this Court to consider the relief requested in the Motion, on a final basis.  All objections, if any, to the Motion shall be in writing and filed with this Court and served on counsel for the Debtors, any duly appointed statutory committee, counsel for the Debtors' prepetition secured lenders, counsel for the Debtors' proposed DIP lender, and counsel for Gordon Brothers, so as to be received on or before _____, 2018 at _____ __.m. (prevailing Eastern Time).  The Debtors shall have no obligation to file any reply(s) to such objections.  Counsel for the Debtors is directed to serve a copy of this Order as notice of such hearing to the parties as required by the *Order Establishing Notice and Administrative Procedures* (Docket # ___) and file a certificate of service with the Court.

3.     The Debtors are authorized and empowered to take any and all further actions as may be reasonably necessary or appropriate to give effect to this Interim Order.

4.     To the extent of any conflict between this Interim Order, the Sale Guidelines and the Store Closing Agreement, the terms of this Interim Order shall control over all other

documents and the Sale Guidelines (as modified by any Side Letter (as defined herein)) shall control over the Store Closing Agreement.

5.      Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall take effect immediately upon its entry.

**A.      Assumption of the Store Closing Agreement**

6.      The Store Closing Agreement, a copy of which is attached to this Interim Order as Exhibit 1, is hereby assumed on an interim basis pending entry of a final order pursuant to section 365 of the Bankruptcy Code.  The Debtors are authorized to act and perform in accordance with the terms of the Store Closing Agreement, including, making all payments of fees and expenses required by the Store Closing Agreement to Gordon Brothers without the need for any application of Gordon Brothers or a further order of the Court.  Notwithstanding this or any other provision of this Interim Order, nothing shall prevent or be construed to prevent Gordon Brothers and any of its affiliates (individually, as part of a joint venture, or otherwise) from bidding on any of the Debtors' assets pursuant to an agency agreement or otherwise, and Gordon Brothers and its affiliates are hereby authorized to bid on or otherwise acquire such assets notwithstanding anything to the contrary in the Bankruptcy Code or other applicable law, provided that such transaction or acquisition is approved by separate order of this Court.

7.      Subject to the restrictions set forth in this Interim Order and the Sale Guidelines, the Debtors and Gordon Brothers hereby are authorized to take any and all actions as may be necessary or desirable to implement the Store Closing Agreement and the Store Closing Sales; and each of the transactions contemplated by the Store Closing Agreement, and any actions taken by the Debtors and Gordon Brothers necessary or desirable to implement the Store Closing Agreement and/or the Store Closing Sales prior to the date of this Interim Order, hereby are approved and ratified.

**B.      Authority To Operate the Store Closing Sales**

8.      The Debtors are authorized, on an interim basis pending the Final Hearing, pursuant to 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately continue and conduct Store Closing Sales at the Stores (and, if applicable, Additional Stores) in accordance with this Interim Order, the Sale Guidelines, the Store Closing Agreement and any Side Letter.

9.      The Sale Guidelines are approved in their entirety on an interim basis.

10.      The Debtors are authorized to discontinue operations at the Stores (and, if applicable, Additional Stores) in accordance with this Interim Order and the Sale Guidelines. Subject to entry of the Final Order, all entities that are presently in possession of some or all of the Merchandise or Offered FF&E in which the Debtors hold an interest that is or may be subject to the Store Closing Agreement are directed to surrender possession of such Merchandise or Offered FF&E to the Debtors or Gordon Brothers.

11.      Subject to the provisions herein in Paragraphs 13, 15, 16 and 26, neither the Debtors nor Gordon Brothers nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined in Bankruptcy Code section 101(27)) or landlord, to conduct the Store Closing Sales and to take the related actions authorized herein.

**C.      Conduct of the Store Closing Sales**

12.      All newspapers and other advertising media in which the Store Closing Sales may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Debtors and Gordon Brothers to conduct the Store Closing Sales and the sale of Merchandise and Offered FF&E pursuant to the Store Closing Agreement, including, without limitation, to conduct and advertise the sale of the Merchandise and Offered FF&E in the manner

contemplated by and in accordance with this Interim Order, the Sale Guidelines and the Store Closing Agreement.

13.     Nothing in this Interim Order or the Store Closing Agreement releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order.  Nothing contained in this Interim Order or in the Store Closing Agreement shall in any way (a) diminish the obligation of any entity to comply with environmental laws, or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.  Nothing herein shall be construed to be a determination that Gordon Brothers is an operator with respect to any environmental law or regulation.  Moreover, the sale of the Merchandise and Offered FF&E shall not be exempt from, and Gordon Brothers shall be required to comply with, laws of general applicability, including, without limitation, laws relative to public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws").  Nothing in this Interim Order shall alter or affect the Debtors' and Gordon Brothers' obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Interim Order shall be deemed to bar any Governmental Unit from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' or Gordon Brothers' right to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Interim Order, or otherwise, pursuant to Paragraph 26

hereunder.  Notwithstanding any other provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code.  Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

14.     Except to the extent of the reserved rights of Governmental Units expressly granted elsewhere in this Interim Order, during the Store Closing Sales, the Debtors and Gordon Brothers are hereby authorized to take such actions as may be necessary and appropriate to implement the Store Closing Agreement and to conduct the Store Closing Sales without necessity of further order of this Court as provided in the Store Closing Agreement or the Sale Guidelines, including, but not limited to, advertising the Store Closing Sale as a "store closing sale", "sale on everything", "everything must go", or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall stores, and at enclosed mall stores to the extent the applicable store entrance does not require entry into the enclosed mall common area), use of sign-walkers and street signage.

15.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise and Offered FF&E, to the extent that, prior to the Final Hearing, disputes arise during the course of the Store Closing Sales regarding laws regulating the use of sign-walkers, banners or other advertising and the Debtors and Gordon Brothers are unable to resolve the matter consensually with a Governmental Unit, any party may request an immediate telephonic hearing with this Court pursuant to these provisions.  Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (a) the Final Hearing or (b) within two (2) business days of

such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

16. Except as expressly provided in the Store Closing Agreement, the sale of the Merchandise and Offered FF&E shall be conducted by the Debtors and Gordon Brothers notwithstanding any restrictive provision of any lease, sublease or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store Closing Sales, the rejection of leases, abandonment of assets, or "going dark" provisions. Gordon Brothers and landlords of the Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among Gordon Brothers and any such landlords, provided that nothing in such Side Letters affects the provisions of Paragraphs 13, 15, 16 and 26 of this Interim Order. In the event of any conflict between the Sale Guidelines and any Side Letter, the terms of such Side Letter shall control.

17. Except as expressly provided for herein or in the Sale Guidelines, and except with respect to any Governmental Unit (as to which Paragraphs 13, 15, 16 and 26 of this Interim Order shall apply), no person or entity, including, but not limited to, any landlord, licensor, service providers, utilities, and creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales or the sale of Merchandise or Offered FF&E, or the advertising and promotion (including the posting of signs and exterior banners or the use of sign-walkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service providers, utilities, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding,

the conduct of the Store Closing Sales and/or (b) instituting any action or proceeding in any court (other than in the Bankruptcy Court) or administrative body seeking an order or judgment against, among others, the Debtors, Gordon Brothers, or the landlords at the Stores (and, if applicable, Additional Stores) that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Store Closing Sales or sale of the Merchandise or Offered FF&E or other liquidation sales at the Stores (and Additional Stores) and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

18. In accordance with and subject to the terms and conditions of the Store Closing Agreement, Gordon Brothers shall have the right to use the Stores (and, if applicable, Additional Stores) and all related store services, furniture, fixtures, equipment and other assets of the Debtors for the purpose of conducting the Store Closing Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines and this Interim Order and subject to Paragraphs 13, 15, 16 and 26 of this Interim Order.

19. To the extent authorized by an Order entered by the Court on *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief* filed on the Petition Date, Gordon Brothers shall accept the Debtors' validly-issued gift certificates and gift cards that were issued by the Debtors prior to the Sale Commencement Date in accordance with the Debtors' gift certificate and gift card policies and procedures, as such policies and procedures existed on the Petition Date, and accept returns of merchandise sold by the Debtors prior to the Sale Commencement Date, provided that such return is otherwise in compliance with the Debtors' return policies in effect as of the date such

- 11 -

item was purchased and the customer is not repurchasing the same item so as to take advantage of the sale price being offered by Gordon Brothers.

20.    All sales of Sale Assets shall be "as is" and final.  However, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."  Further, the Debtors and/or Gordon Brothers shall accept return of any goods purchased during the Store Closing Sales that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within seven days of purchase, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect.  Signs stating that "[r]efunds may only be for merchandise having a latent defect, when returned within 7 days of purchase" will be posted at the cash register area of the Stores.

21.    Gordon Brothers shall not be liable for sales taxes except as expressly provided in the Store Closing Agreement and the payment of any and all sales taxes is the responsibility of the Debtors.  The Debtors are directed to remit all taxes arising from the Store Closing Sales to the applicable Governmental Units as and when due, provided that in the case of a bona fide dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected.  Gordon Brothers shall collect, remit to the Debtors and account for sales taxes as and to the extent provided in the Store Closing Agreement.  This Interim Order does not enjoin, suspend or restrain the assessment, levy or collection of any tax under state law, and does

not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

22.    Pursuant to section 363(f) of the Bankruptcy Code, Gordon Brothers, on behalf of the Debtors, is authorized to sell, and all sales of Merchandise or Offered FF&E (each as defined in the Store Closing Agreement) pursuant to the Store Closing Sales, whether by Gordon Brothers or the Debtors, shall be free and clear of any and all Encumbrances; provided, however, that any such Encumbrances shall attach to the proceeds of the Store Closing Sales with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Merchandise and Offered FF&E, subject to any claims and defenses that the Debtors may possess with respect thereto.

23.    To the extent that the Debtors propose to sell or abandon Offered FF&E which may contain personal and/or confidential information about the Debtors' employees and/or customers ("Confidential Information"), the Debtors shall remove the Confidential Information from such items of Offered FF&E before such sale or abandonment.

24.    The Debtors and/or Gordon Brothers (as the case may be) are authorized and empowered to transfer Merchandise and Offered FF&E among the Stores.  Gordon Brothers is authorized to sell the Debtors' Offered FF&E and abandon the same, in each case, as provided for and in accordance with the terms of the Store Closing Agreement.

**D.    Dispute Resolution Procedures With Governmental Units**

25.    To the extent that the sale of Merchandise or Offered FF&E is subject to any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws (each a "GOB Law," and collectively, the "GOB Laws"), including laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of

- 13 -

signage, and use of sign-walkers solely in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale of the Sale Assets (collectively, the "Liquidation Laws"), the dispute resolution procedures in this section shall apply.

26.     Provided that the Store Closing Sales and the sale of Merchandise and Offered FF&E are conducted in accordance with the terms of this Interim Order, the Store Closing Agreement and the Sale Guidelines, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors shall be presumed to be in compliance with any GOB Laws and Liquidation Laws and, subject to Paragraphs 13, 15, 16 and 25 herein, are authorized to conduct the Store Closing Sales in accordance with the terms of this Order and the Sale Guidelines without the necessity of further showing compliance with any such GOB Laws and Liquidation Laws.  However, to the extent there is a dispute arising from or relating to the Store Closing Sales, this Interim Order, the Store Closing Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Laws (a "Reserved Dispute"), the following procedures shall apply:

a.    Except as otherwise provided in paragraph 15, the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute.  Any time within 14 days following service of this Order, any Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute on the Debtors, counsel for the Debtors, and Gordon Brothers.

b.    If the Debtors, Gordon Brothers and the Governmental Unit are unable to resolve the Reserved Dispute within 14 days of service of the notice, the aggrieved party may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

c.    Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of this Order or to limit or interfere with the Debtors' or Gordon Brothers' ability to conduct or to continue to conduct the Store Closing Sales pursuant to this Order and the Store Closing Agreement, absent further order of this Court.

27.     Within three (3) business days of entry of this Interim Order, the Debtors shall serve copies of this Order, the Store Closing Agreement and the Sale Guidelines via e-mail, facsimile or regular mail, on:  (a) the Attorney General's office for each state where the Store Closing Sales are being held, (b)  the county consumer protection agency or similar agency for each county where the Store Closing Sales are being held, (c) the division of consumer protection for each state where the Store Closing Sales are being held; (d) the chief legal counsel for the local jurisdiction; and (e) the Debtors' landlords of the Stores.

**E.     Procedures for Store Closing Sales at Additional Stores.**

28.     If the Debtors, in the exercise of their reasonable business judgment, determine that Store Closing Sales should commence at Additional Stores owned by the Debtors, then the Debtors and Gordon Brothers shall (a) enter into an amendment to the Store Closing Agreement (an "Amendment") which identifies the Additional Stores, the expense budget for such stores, and the start date and end date of the Store Closing Sales at such Additional Stores, and which Amendment shall include any corresponding adjustments to the Aggregate Recovery Percentage and/or Incentive Fee under the Store Closing Agreement as mutually agreed by the Debtors and Gordon Brothers; (b) file the Amendment with the Court; and (c) serve a notice (the "Notice") of their intent to conduct Store Closing Sales at such Additional Stores, along with a copy of the Amendment, on the applicable landlords and the Master Service List (as set forth in the *Debtors' Emergency Motion for an Order Establishing Notice and Administrative Procedures* filed contemporaneously herewith) by email (to the extent available to the Debtors) or overnight mail. Any objection to the terms of the Amendment or the Store Closing Sales at the Additional Stores shall be filed with the Court within seven (7) days after service of the Notice.  If no timely objections are filed, then the Store Closing Agreement and Amendment, the Sale Guidelines, and any Order approving this Motion shall apply to Store Closing Sales at such Additional Stores,

and the Debtors and Gordon Brothers would be authorized to proceed with conducting Store

Closing Sales at the Additional Stores in accordance therewith.  If an objection is filed, the

matter would be scheduled for hearing on an expedited basis.

**F.      Other Provisions.**

29.      The Store Closing Agreement and related documents may be modified, amended

or supplemented by the parties thereto in accordance with the terms thereof without further order

of this Court.

30.      Subject to the entry of a Final Order, nothing contained in any plan confirmed in

the Debtors' chapter 11 cases or any order of this Court confirming such plan or in any other

order in these chapter 11 cases (including any order entered after any conversion of this case to a

case under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the

provisions of the Store Closing Agreement or the terms of this Order.

31.      Gordon Brothers is a party in interest and shall have the ability to appear and be

heard on all issues related to or otherwise connected to this Order, the various procedures

contemplated herein, any issues related to or otherwise connected to the Store Closing Sales, and

the Store Closing Agreement.

32.      To the extent the Debtors are subject to any state "fast pay" laws in connection

with the Store Closing Sales, the Debtors shall be presumed to be in compliance with such laws

to the extent, in applicable states, such payroll payments are made by the later of:  (a) the

Debtors' next regularly scheduled payroll; and (b) seven calendar days following the termination

date of the relevant employee, and in all such cases consistent with, and subject to, any previous

orders of this Court regarding payment of same.

33.      Gordon Brothers shall not be liable for any claims against the Debtors, and the

Debtors shall not be liable for any claims against Gordon Brothers, in each case, other than as

expressly provided for in the Store Closing Agreement.

34.     Except with respect to any Governmental Unit (as to which the provisions of Paragraphs 13, 15, 16 and 26 of this Interim Order shall apply), this Court shall retain exclusive jurisdiction with regard to all issues or disputes relating to this Interim Order or the Store Closing Agreement, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (b) any claim of the Debtors, the landlords and/or Gordon Brothers for protection from interference with the Store Closing Sales, (c) any other disputes related to the Store Closing Sales, and (d) to protect the Debtors and/or Gordon Brothers against any assertions of Encumbrances.  No such parties or person shall take any action against the Debtors, Gordon Brothers, the landlords or the Store Closing Sales until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

[END OF DOCUMENT]

**EXHIBIT 1**

**(Store Closing Agreement)**


**Gordon Brothers**
1903

October 31, 2018

To:     Advanced Sports Enterprises, Inc.
        d/b/a Performance Bike ("Merchant")
        One Performance Way
        Chapel Hill, NC 27517

From:   Gordon Brothers Retail Partners, LLC ("Consultant")
        800 Boylston Street, 27th Floor
        Boston, MA 02199

Re:     Store Closing Program – Consulting Agreement

Ladies and Gentlemen:

This letter shall serve as the agreement of Consultant and Merchant pursuant to which Consultant shall serve as the exclusive consultant to Merchant to conduct a "inventory clearance" and other mutually agreed upon themed sale which may include "store closing" ("Sale") at Merchant's retail stores identified on <u>Exhibit A</u> attached hereto (each a "Store" and collectively the "Stores"), subject to the terms and conditions set forth herein.

1. **RETENTION**

(A)    Merchant hereby retains Consultant as its exclusive, independent consultant to conduct the Sale at the Stores during the Sale Term, and in connection therewith, Consultant shall, throughout the Sale Term:

   (i)    Recommend appropriate discounting to effectively sell all of Merchant's goods located at the Stores as of the Sale Commencement Date in accordance with a "store closing" and other mutually agreed upon themed sale, and recommend appropriate point-of-purchase, point-of-sale, and other internal and external advertising in connection therewith.

   (ii)   Provide qualified supervision to oversee the conduct of the Sale.

   (iii)  Maintain focused and constant communication with Store-level employees and managers to keep them abreast of strategy and timing and to properly effect Store-level communication by Merchant's employees to customers and others about the Sale.



Prudential Tower                    + 1 617.426.3233
800 Boylston Street, 27th floor     gordonbrothers.com
Boston, MA 02199 USA

(iv)    Establish and monitor accounting functions for the Sale, including evaluation of sales of Merchant's goods located at the Stores by category, sales reporting and expense monitoring.

(v)    Recommend loss prevention strategies.

(vi)    Coordinate with Merchant so that the operation of the Stores is being properly maintained including ongoing customer service and housekeeping activities.

(vii)    Recommend customized strategies to transition Merchant's customers to Merchant's ongoing retail stores and e-commerce platform.

(viii)    Recommend appropriate staffing levels for the Stores and appropriate bonus and/or incentive programs (to be funded by Merchant) for Store employees.

(ix)    Prior to any bankruptcy filing by Merchant, advise Merchant with respect to the legal requirements of affecting the Sale as a "store closing" or other mutually agreed upon theme in compliance with applicable state and local "going out of business" laws; and in connection with such obligation, Consultant will (i) advise Merchant of the applicable waiting period under such laws, and/or (ii) prepare (in Merchant's name and for Merchant's signature) all permitting paperwork as may be necessary under such laws, deliver all such paperwork to Merchant, and file, on behalf of Merchant, all such paperwork where necessary, and/or (iii) advise where permitting paperwork and/or waiting periods do not apply; and

(x)    From and after any bankruptcy filing by Merchant, conduct the Sale in accordance with the Approval Order (as defined below).

## 2.    SALE TERM; VACATING STORES

(A)    The term "Sale Term" with respect to each respective Store shall commence on or about the date identified on Exhibit B ("Sale Commencement Date") and shall end on the date identified on Exhibit B ("Sale Termination Date"); provided however, that Consultant and Merchant may mutually agree upon an earlier or later "Sale Termination Date" with respect to any one or more Stores (on a Store-by-Store basis).

(B)    Upon the conclusion of the Sale Term at each Store, Consultant shall leave such Store in broom clean condition, subject to Consultant's right pursuant to Section 6 below to abandon in a neat and orderly manner all unsold Offered FF&E and all Retained FF&E.

## 3.    EXPENSES

(A)    All expenses incident to the conduct of the Sale and the operation of the Stores during the Sale Term (including without limitation all Consultant Controlled Expenses and all other store-level and corporate expenses associated with the Sale) shall be borne by Merchant; except solely for any of the specifically enumerated "Consultant Controlled Expenses" that exceed the





aggregate budgeted amount (as provided in Section 3(B) below) for such Consultant Controlled Expenses.

(B)     Attached hereto as <u>Exhibit B</u> is an expense budget for the "Consultant Controlled Expenses." Consultant will advance funds for the Consultant's Controlled Expenses, and Merchant shall reimburse Consultant therefor (up to the aggregate budgeted amount) in connection with each weekly reconciliation contemplated by Section 5(B) upon presentation of reasonable documentation for such actually-incurred expenses. The parties may from time to time mutually agree in writing to increase the budget of Consultant Controlled Expenses based upon circumstances of the Sale.

## 4.     CONSULTANT COMPENSATION

(A)     As used herein, the following terms shall have the following meanings:

(i)     "Gross Proceeds" shall mean the gross proceeds of all sales of Merchandise and all new service revenue sold in the Stores during the Sale Term, net only of sales taxes. For purposes of this Agreement, the term "service revenue earned in the Stores during the Sale Term" means fees and other proceeds received by the Merchant in respect of repair and other non-Merchandise sales/services actually received by the Merchant during the Sale Term (including, without limitation, any Spin Doctor™ service), and expressly excludes any revenue received by Merchant prior to the Sale Term in respect of the sale of any service or other plan purchased by any customer prior to the applicable Sale Commencement Date even if such services are performed during the Sale Term.

(ii)     "Merchandise" shall mean the goods actually sold in the Stores during the Sale Term, the aggregate amount of which shall be determined using the gross rings inventory taking method.

(iii)     "Aggregate Recovery Percentage" shall mean the Gross Proceeds divided by the aggregate Cost Value of all of the Merchandise actually sold in the Stores during the Sale Term.

(iv)     "Cost Value" with respect to each item of Merchandise sold shall be determined by reference to the per unit cost in Merchant's books and records, maintained in the ordinary course consistent with historic practices.

(B)     In consideration of its services hereunder, Merchant shall pay Consultant an "Incentive Fee" as one of the following (e.g., back to first dollar):

| Aggregate Recovery Percentage | Incentive Fee |
|---|---|
| Below 90.0% | 0.00% of Gross Proceeds |
| Between 90.1% and 100.0% | 1.00% of Gross Proceeds |
| Between 100.1% and 110.0% | 1.25% of Gross Proceeds |
| Between 110.1% and 115.0% | 1.50% of Gross Proceeds |
| Above 115.1% | 1.75% of Gross Proceeds |

(C)     On a weekly basis in connection with each weekly reconciliation contemplated by Section 5(B) below, Merchant shall pay Consultant an amount equal to 1.00% of Gross Proceeds





on account of the prior week's sales as an advance on account of the fees payable hereunder. The parties shall determine the Aggregate Recovery Percentage in connection with the Final Reconciliation; and thus at such time the definitive Incentive Fee also will be determined in connection with the Final Reconciliation. Immediately thereafter (and as part of the Final Reconciliation), (i) Merchant shall pay Consultant any additional amount owed on account of the Incentive Fee, or (ii) Consultant shall refund Merchant any amount received for the Incentive Fee if Aggregate Recovery Percentage does not exceed 90.0%.

**5.      CONDUCT OF SALE; OTHER SALE MATTERS**

(A)      Merchant shall have control over the personnel in the Stores and shall handle the cash, debit and charge card payments for all Merchandise in accordance with Merchant's normal cash management procedures, subject to Consultant's right to audit any such items. Merchant (and not Consultant) shall be responsible for ensuring that the Sale, and the operation of the Stores (before, during, and after the Sale Term) shall be conducted in compliance with all applicable laws and regulations.

(B)      The parties will meet on each Wednesday during the Sale Term to review any Sale matters reasonably requested by either party; and all amounts payable or reimbursable to Consultant for the prior week (or the partial week in the case of the first and last weeks) shall be reconciled and paid immediately thereafter. No later than twenty (20) days following the end of the Sale, the parties shall complete a final reconciliation and settlement of all amounts contemplated by this Agreement ("Final Reconciliation"). From time to time upon request, each party shall prepare and deliver to the other party such other reports as either party may reasonably request. Each party to this Agreement shall, at all times during the Sale Term and during the one (1) year period thereafter, provide the other with access to all information, books and records relating to the Sale and to this Agreement. All records and reports shall be made available to Consultant, Merchant, and Merchant's senior secured lender, Wells Fargo Bank, National Association, during regular business hours upon reasonable notice.

(C)      Merchant shall be solely responsible for the computing, collecting, holding, reporting, and paying all sales taxes associated with the sale of Merchandise during the Sale Term, and Consultant shall have absolutely no responsibilities or liabilities therefor.

(D)      Although Consultant shall undertake its obligations under this Agreement in a manner designed to achieve the desired results of the Sale and to maximize the recovery to the Merchant, Merchant expressly acknowledges that Consultant is not guaranteeing the results of the Sale.

(E)      Merchant acknowledges that (i) the parties are not conducting an inventory of Merchant's goods located at the Stores; (ii) Consultant has made no independent assessment of the beginning levels of such goods; and (iii) Consultant shall not bear any liability for shrink or other loss to Merchant's goods located at the Stores (including without limitation Merchandise).

(F)      All sales of Merchandise in the Stores during the Sale shall be made in the name, and on behalf, of Merchant.





(G)    All sales of Merchandise in the Stores, only if a store closing sale has begun, shall be "final sales" and "as is," and all advertisements and sales receipts will reflect the same.

(H)    Consultant shall, during the Sale Term at the Stores, cooperate with Merchant in respect of Merchant's procedures governing returns of goods otherwise sold by Merchant (e.g., not in the Stores during the Sale Term).

(I)    Subject to compliance with any applicable laws, Merchant hereby permits the Sale to be, and shall ensure that the Sale otherwise may be, advertised as an "inventory clearance" or other mutually agreed upon handle or a "Store Closing" only if the Merchant becomes subject to a chapter 11 bankruptcy case.

(J)    Concurrently with the execution of, and as a condition to Consultant's obligations under, this Agreement, Merchant shall fund to Consultant $215,000 (the "Special Purpose Payment") which shall be held by Consultant until the Final Reconciliation (and Merchant shall not apply the Special Purpose Payment to, or otherwise offset any portion of the Special Purpose Payment against, any weekly reimbursement, payment of fees, or other amount owing to Consultant under this Agreement prior to the Final Reconciliation). Without limiting any of Consultant's other rights, Consultant may apply the Special Purpose Payment to any unpaid obligation owing by Merchant to Consultant under this Agreement. Any portion of the Special Purpose Payment not used to pay amounts explicitly contemplated by this Agreement shall be returned to Merchant within three days following the Final Reconciliation.

**6.    <u>FF&E</u>**
(A)    Promptly following the Sale Commencement Date, Merchant shall inform Consultant of those items of furniture, fixtures, and equipment located at the Stores which are not to be sold (collectively, "Retained FF&E").

(B)    With respect to all furniture, fixtures, and equipment located at the Stores as of the Sale Commencement Date which is not Retained FF&E (collectively the "Offered FF&E"), Consultant shall have the right to sell such Offered FF&E during the Sale Term on a commission basis equal to fifteen percent (15.0%) of the gross sales of Offered FF&E, net only of sales tax ("FF&E Commission").

(C)    Merchant shall reimburse Consultant for its reasonable sale expenses associated with the sale of the Offered FF&E, not to exceed the amount shown on an FF&E expense budget (which shall be in addition to the Consultant Controlled Expenses budget), to be mutually and reasonably agreed to by the parties promptly after Merchant identifies/designates/distinguishes between the Offered FF&E and Retained FF&E ("FF&E Expenses").

(D)    Subject to approval of the Bankruptcy Court (as defined below), Consultant shall have the right to abandon any unsold Offered FF&E (and all Retained FF&E) at the Stores at the conclusion of the Sale Term without liability to Merchant or any third party.





7.    **INSURANCE; RISK OF LOSS**
During the Sale Term: (a) Merchant shall maintain (at its expense) insurance with respect to the Merchandise in amounts and on such terms and conditions as are consistent with Merchant's ordinary course operations, and (b) each of Merchant and Consultant shall maintain (at each party's respective expense) comprehensive liability insurance covering injuries to persons and property in or in connection with the Stores, in such amounts as are reasonable and consistent with its ordinary practices, for bodily injury, personal injury and/or property damage.  Each party shall be added as an additional insured on all such insurance of the other party, all such insurance shall provide that it shall be non-cancelable and non-changeable except after 30 days' prior written notice to the other party, and each party shall provide the other with certificates of all such insurance prior to the commencement of the Sale.

Notwithstanding any other provision of this Agreement, Merchant and Consultant agree that Consultant shall not be deemed to be in possession or control of the Stores, or the Merchandise or other assets located therein or associated therewith, or of Merchant's employees located at the Stores; and Consultant does not assume any of Merchant's obligations or liabilities with respect thereto.

Notwithstanding any other provision of this Agreement, Merchant and Consultant agree that Merchant shall bear all responsibility for liability claims (product liability and otherwise) of customers, employees and other persons arising from events occurring at the Stores, and Merchandise sold in the Stores, before, during and after the Sale Term.

8.    **INDEMNIFICATION**
(A)    Consultant shall indemnify and hold Merchant and its affiliates, and their respective officers, directors, employees, consultants, and independent contractors (collectively, "Merchant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to:

    (i)    Consultant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

    (ii)    any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant by Consultant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives (including without limitation any supervisors);

    (iii)    any claims by any party engaged by Consultant as an employee or independent contractor (including without limitation any non-Merchant employee supervisor) arising out of such employment or engagement; or

    (iv)    the negligence, willful misconduct or unlawful acts of Consultant, its affiliates or their respective officers, directors, employees, Consultants, independent contractors or representatives.



1903



(B)    Merchant shall indemnify and hold Consultant, its affiliates and their respective officers, directors, employees, consultants, and independent contractors (collectively, "Consultant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to:

    (i)    Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

    (ii)   any claims by any party engaged by Merchant as an employee or independent contractor arising out of such engagement;

    (iii)  any consumer warranty or products liability claims relating to any Merchandise; and/or

    (iv)   the negligence, willful misconduct or unlawful acts of Merchant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives.

## 9.    **MISCELLANEOUS**

(A) In the event Merchant becomes subject to a chapter 11 bankruptcy case in any United States Bankruptcy Court (the "Bankruptcy Court"), Merchant shall promptly seek to have this Agreement, and the transactions contemplated by this Agreement, approved by the Bankruptcy Court pursuant to Sections 363 and 365 of the United States Bankruptcy Code and an order acceptable to both Merchant and Consultant, which order shall specifically provide, among other things, that: (i) Merchant assumes this Agreement and the transactions contemplated by this Agreement, including (without limitation) with respect to the payment of all fees and reimbursement of expenses, (ii) authorizing the Sale without the necessity of complying with federal or provincial rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that would otherwise govern the Sale; (iii) authorizing the Sale notwithstanding restrictions in leases, occupancy agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents; and (iv) take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement (such order, the "Approval Order").

(B) Consultant hereby discloses, and Merchant hereby acknowledges, that:

    (1)    Gordon Brothers Retail Partners, LLC's ("GBRP") affiliate, Gordon Brothers Asset Advisors, LLC ("GBAA"), has in the past and is tentatively scheduled to perform an appraisal of certain of Merchant's assets on behalf of a secured lender thereto in December 2018; and

    (2)    (i)    GBRP affiliate DJM Realty Services, LLC (also d/b/a Gordon Brothers Real Estate; "DJM") entered into a confidentiality agreement with the Merchant in December 2016 relating to a potential real estate services transaction, but DJM did not enter into any such transaction;





(ii)    Gordon Brothers Finance Company ("Finance Company") evaluated a potential financing transaction relating to the Merchant, but no such transaction has been entered into by Finance Company.  GBRP's parent entity, Gordon Brothers Group, LLC ("GBG"), holds a minority interest in Finance Company, but Finance Company is not an affiliate of GBRP;

(iii)    Pursuant to a contractual arrangement with GBG, certain of GBRP's affiliates have provided ordinary course due diligence services to Finance Company (most recently in September 2017) in connection with Finance Company's evaluation of the potential financing transaction relating to the Merchant. As of the date hereof, no such GBRP affiliate is providing any such due diligence-related services to Finance Company or any other person or entity; and

(iv)    The Merchant assets evaluated by DJM and other GBG affiliates as described in the foregoing clauses may include assets subject to the engagement contemplated by this agreement.

Merchant hereby waives any actual or perceived conflict resulting from any of the foregoing.

(C) This Agreement constitutes the entire agreement between the parties with respect to the matters contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto. This Agreement may not be modified except in a written instrument executed by each of the parties hereto.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  The failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.  Nothing contained in this Agreement shall be deemed to create any relationship between Merchant and Consultant other than that of Consultant as an independent contractor of Merchant, and it is stipulated that the parties are not partners or joint venturers in any way.  Unless expressly set forth herein to the contrary, to the extent that either party's consent is required/requested hereunder, such consent shall not be unreasonably withheld or delayed.  This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns; provided however, that this Agreement may not be assigned by either party without the prior written consent of the other.  Written notices contemplated by this Agreement shall be sent by email (i) if to Merchant c/o the person indicated below at the address specified above; and (ii) if to Consultant c/o Mackenzie Shea at mshea@gordonbrothers.com





Very truly yours,

**Gordon Brothers Retail Partners, LLC**

By: _____

Print Name and Title:

Agreed and Accepted:

**Advanced Sports Enterprises, Inc.**
**d/b/a Performance Bike**

By: _____

Print Name and Title:

Address:

Exhibits:

A     Stores

B     Budget of Consultant Controlled Expenses

2396410.2



## Performance Bicycle
### Store List
### Exhibit A

| Store No. | Store | | Address | City | State | Zip Code | Square Ft |
|---|---|---|---|---|---|---|---|
| 8 | 8 | Littleton | 5066 S Wadsworth Blvd. | Littleton | CO | 80123 | 8,999 |
| 9 | 9 | San Rafael | 369 Third St. | San Rafael | CA | 94901 | 5,850 |
| 19 | 19 | Baltimore | 1991 E. Joppa Road | Baltimore | MD | 21234 | 5,003 |
| 26 | 26 | Lincoln Park | 2720 N. Halsted St. | Lincoln Park | IL | 60614 | 4,842 |
| 30 | 30 | Colorado Springs | 4284 N. Academy Blvd. | Colorado Springs | CO | 80918 | 6,924 |
| 32 | 32 | Northbrook | 315 Skokie Blvd. | Northbrook | IL | 60062 | 4,913 |
| 33 | 33 | Charlottesville | 381 Hillsdale Drive | Charlottesville | VA | 22901 | 5,000 |
| 42 | 42 | Gaithersburg | 357 Muddy Branch Road | Gaithersburg | MD | 20878 | 7,915 |
| 44 | 44 | Vienna | 8387 Leesburg Pike | Vienna | VA | 22182 | 6,000 |
| 49 | 49 | Kearney Mesa | 7730 Ronson Rd. | Kearney Mesa | CA | 92111 | 6,000 |
| 63 | 63 | Tualitan | 7073 SW Nyberg St | Tualitan | OR | 97062 | 7,500 |
| 65 | 65 | San Francisco | 635 Brannan St. | San Francisco | CA | 94107 | 9,160 |
| 66 | 66 | Roswell | 10502A Alpharetta Hwy | Roswell | GA | 30076 | 6,500 |
| 70 | 70 | Fountain Valley | 8850 Warner Avenue | Fountain Valley | CA | 92708 | 15,000 |
| 71 | 71 | Oceanside | 3833 Plaza Drive #701 | Oceanside | CA | 92056 | 15,821 |
| 75 | 75 | Seattle | 4501 Roosevelt Way NE | Seattle | WA | 98105 | 12,780 |
| 76 | 76 | Oxnard | 1700 East Ventura Blvd. | Oxnard | CA | 93036 | 8,200 |
| 86 | 86 | Berkeley | 1824 University Ave | Berkeley | CA | 94703 | 7,009 |
| 88 | 88 | Peoria | 8402 W. Thunderbird Rd. | Peoria | AZ | 85381 | 5,972 |
| 89 | 89 | N Austin | 2900 West Anderson Lane | N Austin | TX | 78757 | 8,400 |
| 91 | 91 | N Houston | 4750 FM 1960 West | N Houston | TX | 77069 | 10,520 |
| 92 | 92 | W Houston | 7549 Westheimer Road | W Houston | TX | 77063 | 7,165 |
| 93 | 93 | Mayfield Heights | 1509 Golden Gate Plaza | Mayfield Heights | OH | 44124 | 8,201 |
| 94 | 94 | Schaumburg | 155 W. Golf Road | Schaumburg | IL | 60195 | 6,600 |
| 97 | 97 | Dayton | 4466 Indian Ripple Rd | Dayton | OH | 45440 | 7,936 |
| 100 | 100 | Dublin | 7000 Amador Plaza Rd | Dublin | CA | 94568 | 5,509 |
| 108 | 108 | Lynnwood | 3225 Alderwood Mall Blvd | Lynnwood | WA | 98036 | 6,500 |
| 110 | 110 | San Mateo | 2727 El Camino Real | San Mateo | CA | 94403 | 7,732 |
| 111 | 111 | Woodland Hills | 6400 Owensmouth Avenue | Woodland Hills | CA | 91367 | 8,158 |
| 115 | 115 | Pittsburgh | 6401 Penn Ave | Pittsburgh | PA | 15206 | 8,000 |
| 117 | 117 | Columbia | 6455 Dobbin Road | Columbia | MD | 21045 | 7,000 |
| 120 | 120 | Roseville | 1901 Douglas Blvd | Roseville | CA | 95661 | 6,681 |
| 121 | 121 | Southlake | 2915 East State Highway 114 | Southlake | TX | 76092 | 8,030 |
| 126 | 126 | Orland Park | 15876 South Lagrange Road | Orland Park | IL | 60462 | 8,000 |
| 127 | 127 | Midway | 4051 LBJ Freeway, Suite 110 | Midway | TX | 75244 | 8,109 |
| 130 | 130 | Novi | 43235 Crescent Blvd. | Novi | MI | 48375 | 9,316 |
| 134 | 134 | Ft Lauderdale | Sunrise Square Shopping Center | Ft Lauderdale | FL | 33304 | 8,148 |
| 135 | 135 | Tampa | 625 North Dale Mabry | Tampa | FL | 33609 | 6,707 |
| 136 | 136 | Winter Park | 351 North Orlando Ave. | Winter Park | FL | 32789 | 7,247 |
| 138 | 138 | Jacksonville | 4421 Southside Blvd. | Jacksonville | FL | 32216 | 10,210 |

**40**

Avg Sqr Ft.    **7,839**

**Performance Bicycle**
**Expense Budget**
**Exhibit B**

| | |
|---|---|
| Start Date | 11/2/2018 |
| End Date | 1/27/2019 |
| # of Stores | 40 |
| # of Weeks | 12.4 |

| | Total Dollars |
|---|---|
| **Advertising Budget** | |
| Media/Digital | 50,000 |
| Signs and Banners | 104,000 |
| Sign walkers | 199,095 |
| **Total Advertising** | **353,095** |
| | |
| **Supervision** | **470,936** |
| | |
| **Miscellaneous** | **25,000** |
| | |
| **Total Expense Budget** | **849,031** |

Notes:

1) This expense budget is based upon the above Sale Term. Any changes to the Sale Term may result in adjustments to the expense budget, which will be agreed upon by Merchant and GBRP.

2) Supervision assumes that we will leverage 2 of the company's DMs to supervise the store closing project. This expense is not included in this budget.

3) Legal expenses are included in the miscellaneous line. Any legal expenses associated with landlord and side letters shall be in addition to and not part of miscellaneous above.

## **EXHIBIT 2**

**(Sale Guidelines)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**DURHAM DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Advanced Sports Enterprises, Inc., *et al.*,[1] | ) | |
| | ) | Case No. 18-80856 |
| | ) | (Joint Administration Pending) |
| | ) | |
| Debtors. | ) | |
| | ) | |

## SALE GUIDELINES

The following procedures shall apply to the liquidation sales (collectively, the "Sale") to be held at the Debtors' store locations (the "Stores"):

1.      The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

2.      The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Debtors had been operating such Store on a Sunday.

3.      On "shopping center" property, the Debtors or Gordon Brothers shall not distribute handbills, leaflets or other written materials to customers outside of any Store's premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that the Debtors and Gordon Brothers may solicit customers in the Stores themselves. On "shopping center" property, the Debtors and Gordon Brothers shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.      At the conclusion of the Sale, the Debtors shall vacate the Stores in broom clean condition, and shall leave the Stores in the same condition as on the Sale Commencement Date, ordinary wear and tear excepted, provided, however, that the Debtors and Gordon Brothers hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store.

---

[1] The Debtors in this case, along with each Debtor's case number, are: (i) Advanced Sports Enterprises, Inc., Case No. 18-80856; (ii) Advanced Sports, Inc., Case No. 18-80857; (iii) Performance Direct, Inc., Case No. 18-80860; (iv) Bitech, Inc., Case No. 18-80858; and (v) Nashbar Direct, Inc., Case No. 18-80859. Each Debtor is a North Carolina Corporation.

5.    Subject to the entry of the final Approval Order:  (a) Gordon Brothers and the Debtors may abandon any FF&E and Merchandise not sold in the Sale at the Stores at the earlier of the conclusion of the Sale or the applicable Sale Termination Date; (b) any abandoned FF&E and Merchandise left in a Store after a lease is rejected shall be deemed abandoned to the landlord, with the landlord having the right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Debtors.

6.    Gordon Brothers and the Debtors may advertise the Sale as a "store closing", "sale on everything", "everything must go", or similar themed sale.  Gordon Brothers and the Debtors may also advertise the sale as a "store closing" and have a "countdown to closing" sign prominently displayed in a manner consistent with these Sale Guidelines.

7.    Gordon Brothers and the Debtors shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  Gordon Brothers and the Debtors shall not use neon or day-glo on its display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, Gordon Brothers and the Debtors shall be permitted to utilize exterior banners at (a) non-enclosed mall Stores and (b) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall not be wider than the storefront of the Store.  In addition, Gordon Brothers and the Debtors shall be permitted to utilize sign-walkers in a safe and professional manner.  Nothing contained in these Sale Guidelines shall be construed to create or impose upon Gordon Brothers and the Debtors any additional restrictions not contained in the applicable lease agreement.

8.    Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

9.    Except with respect to the hanging of exterior banners, Gordon Brothers and the Debtors shall not make any alterations to the storefront or exterior walls of any Stores.

10.    Gordon Brothers and the Debtors shall not make any alterations to interior or exterior Store lighting.  No property of the landlord of a Store shall be removed or sold during the Sale.  The hanging of exterior banners or signage or banners in a Store shall not constitute an alteration to a Store.

11.    Gordon Brothers and the Debtors shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

12.    Subject to the provisions of the Store Closing Agreement, Gordon Brothers and the Debtors shall have the right to sell all FF&E.  Gordon Brothers and the Debtors may advertise the sale of the FF&E in a manner consistent with these guidelines at the Stores.  The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, through the front door of the Store if such items can

be carried within a shopping bag, or through other areas after Store business hours.

13.     At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Store's premises as set forth in the applicable leases.  Gordon Brothers, the Debtors and their agents and representatives shall continue to have exclusive and unfettered access to the Stores until the respective Stores are turned back to the landlord in a manner consistent with the lease rejection procedures approved by the Court.

14.     Postpetition rents shall be paid by the Debtors as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.

15.     The rights of landlords against Debtors for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

16.     If and to the extent that the landlord of any Store affected hereby contends that Gordon Brothers and the Debtors are in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Debtors' counsel and Gordon Brothers' counsel as follows: (i) Flaster/Greenberg P.C., 1835 Market Street, Suite 1050, Philadelphia, PA 19013 (Attn: William J. Burnett, william.burnett@flastergreenberg.com); and (ii) Greenberg Traurig, LLP, One International Place, 20th Floor, Boston, MA 02110 (Attn: Jeffrey M. Wolf, wolfje@gtlaw.com).